Argued 5 January; decided 27 February, 1899.

**STATE v. RENICK.**

[44 L. R. A. 266, 56 Pac. 275]

FALSE PRETENSES—FALSE TOKEN.—A person is not himself a false token so as to be indictable for obtaining money by means of a false token and false pretenses, under sections 1776 and 1372, Hill's Ann.' Laws, where he procures money from a woman by a promise of marriage, and by offering himself to her under a fictitious name, and by falsely stating that he is unmarried.

From Multnomah: THOS. A. STEPHENS, Judge.

George Renick having been indicted for obtaining money by false pretenses demurred to the indictment. The demurrer was sustained, and the state appeals.

AFFIRMED.

For the state there was a brief over the names of *Chas. F. Lord*, former district attorney, and *Cicero M. Idleman*, attorney-general, with an oral argument by *Mr. Idleman* and *Mr. Russell E. Sewall*, district attorney.

For respondent there was a brief over the name of *Stott, Boise & Stout*, with an oral argument by *Mr. Geo. C. Stout*.

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

The indictment in this case charges, in substance, that the defendant, George Renick, did on the tenth day of November, 1896, in Multnomah County, Oregon, willfully and feloniously, with intent to defraud, by means of a certain false token, towit, himself, the said George Renick, falsely and fraudulently present himself, the said George Renick, and represent and pretend to one Carrie Meyer, an unmarried woman, that he, the said George Renick, was one Charles Smith, that he was unmarried, and competent and in a position to lawfully contract marriage with her, whereas, in truth and in fact, the said George Renick was not Charles Smith, and was not then unmarried, but had a lawful wife then living; by means of which false token, fraudulent pretense and false representations, coupled with a promise to marry her, the said Carrie Meyer, he, the said George Renick, did then and there obtain of Carrie Meyer divers gold coins, of the value of $190. A demurrer to this indictment was sustained, and the state appeals. It is claimed that the money was obtained by false pretenses, through and by the use of a false token, and that the use by defendant of himself as such false token was sufficient in law to constitute the offense. This presents the only question to be determined.

There was a species of cheat or fraud at common law which was effectuated through the use of deceitful or illegal symbols or tokens, such as were calculated to affect the public at large, and against which common prudence could not have guarded. It was not sufficient upon which to found the offense if a mere privy token was employed,—a counterfeit letter in another person's name, or a private check upon a bank in which the drawer had no funds (*Lara's Case*, 2 Leach, 647, 652)

and the like,— not having the semblance of public authenticity or purporting to be of public consequence, such as spurious money of the realm or bank notes circulating throughout the community as a medium of exchange. But by St. 33 Hen. VIII, chapter I, the obtaining goods by means of false privy tokens, counterfeit letters, etc., is expressly made an indictable offense, and this, Mr. Bishop says, has now become common law with us : 1 Bishop, Cr. Law, § 571. But, as it regards privy tokens at least, this statute has always been considered as creating a new offense : *People* v. *Stone*, 9 Wend. 18. Another species of cheat or fraud at common law was accomplished through the false personation of another : 2 Russell, Crimes, 10, 11. Perhaps the commonly accepted definition of a "common law cheat" is that "it is a fraud wrought by some false symbol or token, of a nature against which common prudence cannot guard, to the injury of one in any pecuniary interest" : 1 Bishop, Cr. Law, § 571 ; 2 Wharton, Cr. Law, § 1116 ; 5 Am. & Eng. Enc. Law (2d ed.) 1025. But Russell, in his work on crimes, gives it a wider signification, and defines it as "the fraudulent obtaining the property of another by any deceitful and illegal practice or token (short of felony) which affects or may affect the public" : 2 Russell, Crimes, 613. See, also, 1 Bouvier Law Dict. p. 317. Under this definition, the cheat need not necessarily be accomplished through the use of a symbol or token, and cases are cited by the learned author, in connection with the definition, which would seem to support his enlarged conception of it. Some cases are cited by Bishop, as *Rex* v. *Jones*, 1 Leach, 174, wherein an apprentice got himself enlisted as a soldier, and thus obtained a bounty, by professing that there was no impediment ; and *Rex* v. *Hanson*, Sayer, 229, wherein a woman was indicted for getting board

and lodging by falsely affirming herself to be single and of the name of Fuller, when she was married and of the name of Hanson. And it is supposed by the author that the boy in the one case and the woman in the other were tokens, and therefore that those cases were disposed of upon that ground only. But, when they are looked into, it does not appear that the decisions were based upon that theory. Indeed, they are so meagerly reported that it is difficult to determine what was the specific ground of their disposal. The broader definition of Russell and Bouvier of a "cheat" at common law would undoubtedly include the offense, as it was in either instance a deceitful practice. In the case of the boy, it was a willful misrepresentation touching his age and apprenticeship; and of the woman, a wrongful personation of another.

There is an old case of *Reg.* v. *Macarty,* 6 Mod. 301, wherein it was charged that Macarty, one of the defendants, falsely represented himself to be a broker, and Fordenborough, the other of such defendants, falsely. pretended to be a merchant, of London, and as such traded in Portugal wines, and that, through such pretensions and representations, they induced one Chown to barter a quantity of hats for a quantity of a spurious and unwholesome wine, represented to be a good and wholesome Portugal wine. In deciding the case upon exceptions to the indictment, HOLT, C. J., says : "The crime is not the selling one thing for another, but here is a false token, the one pretending to be a broker and the other a merchant, and a combination to cheat." *Rex* v. *Govers,* Sayer, 206, is another old case wherein the defendant was indicted for falsely assuming to be a merchant, and producing divers counterfeit commissions purporting to be from Spain, and thereby induced another person to extend him credit. Upon a rule to show cause

why judgment should not be arrested, RYDER, C. J., said:
" The present case is much stronger than than that of
*Reg.* v. *Macarty*, inasmuch as the defendant, besides pre-
tending to be a merchant, did produce several paper
writings, which he affirmed to be letters containing com-
missions to him as merchant." Mr. Russell pertinently
remarks of the first of these cases, that the true ground
of the judgment was that it was a case of conspiracy,
and this was another species of cheat at common law;
and of the second, that the cheat was effected by means
of a forgery, which was in itself a substantive offense,
indictable at common law. The forgery, if successful,
was indictable as a common-law cheat. The broader
definition alluded to would include these offenses also,
without going to the extent of holding that the defend-
ants themselves were tokens.

But, whatever may be the rule and definition touching
the common-law cheat, the statutes of England early
began to distinguish between the different species of
cheat, and to carve out a distinct offense for obtaining
money or property by falsely personating another. Such
an offense has been widely adopted in the American
states, and our own statute has made the act punishable:
Hill's Ann. Laws, § 1776. The statute has also made it
an offense for any person to obtain, or attempt to obtain,
with intent to defraud, any money or property whatever,
by any false pretense, or by any privy or false token:
Hill's Ann. Laws, § 1777. The evidentiary matter nec-
essary to support a charge under the latter section must
consist of a false token or writing accompanying the pre-
tense: Hill's Ann. Laws, § 1372. Construing the two
sections together, the crime known to our statute is
much the same as that constituted by 33 Hen. VIII,
which extended the common-law cheat so as to include
one accomplished through the use of a false privy token

or counterfeit letter.   The two offenses are defined, how-
ever, and made separate and distinct, by statute, so that
there need be no longer a question, as under the common
law, as to whether, in the false personation of another,
the person engaging in the deceit is himself a false token.
It is made a crime to so act, and a case coming fairly
within the statute, it is thought, could not be prosecuted
under the section for obtaining money under false pre-
tenses.   The case at bar, however, is probably not a false
personation, by reason of the fact that the defendant did
not assume to represent a real personage, but only made
use of a fictitious name, having no application to any
one.

But it is contended that he is guilty of a false pretense
by the use of himself as a token.   If that were so, he
must be regarded as a privy token, as his personation was
not calculated, nor was it his purpose, to deceive or im-
pose upon the public in general; the fraud being an impo-
sition upon an individual only, and not extending to the
injury of the public, in the sense of a public cheat.   In the
Jones Case, 1 Leach, 174, the personation was of a class
capable of enlistment in the public service, and the act
operated as a fraud in the procurement of public moneys.
So, in *Rex* v. *Hanson*, Sayer, 229, the woman obtained gen-
eral credit by pretending to be unmarried, thus affecting
the public.   Mr. Wharton puts a case :  "If a pretender
( e. g. Perkin Warbeck or the Tichborne claimant ) palm
himself off on a community as another person, and,
under the guise of his assumed character, obtain credit
from the public at large, he is indictable as a cheat, as-
suming that he imposes upon persons who have no notice
that his claims are disputed, and also addresses his im-
posture to the public at large.   The offense is aimed at
the public generally, and is, supposing there is no notice
to put the others on their guard, aimed as much at the

careful as the careless. Hence it is a cheat at common law." "But suppose," says the learned author, a little further on, "the pretender goes simply to an individual, and with that individual uses his pretended character as a basis for getting money, while there is nothing about the pretender's appearance or general reputation to sustain such character. In such case, there being no latency, since there is a direct subject tendered to the prosecutor on which to make inquiry, and the fraud being pointed at a single individual, it is not a cheat at common law": 2 Wharton, Cr. Law, § 1124. Thus is characterized the distinguishing feature between a token of public import and a privy token or symbol, and the effect of their use in the consummation of the common-law cheat, and it serves as an admirable aid in determining the nature of the supposed token used in the consummation of the offense charged. If, therefore, in the case at bar, the supposed token is a token at all, it should be termed a privy token.

But is the defendant himself even so much as a privy token? Within St. 33 Hen. VIII, such a token was taken to denote "a false mark or sign, forged object, counterfeit letter, key ring, etc., used to deceive persons, and thereby fraudulently get possession of property." Black, Law Dict. See, also, note to *Commonwealth* v. *Speer*, 2 Va. Cas. 67. Mere words are neither symbols nor tokens. Hence it has been held that one who obtains a credit by falsely representing himself to be in trade, and keeping a grocery, utters a mere falsehood. *Commonwealth* v. *Warren*, 6 Mass. 72. So, if one falsely pretends to another that he has been sent by a third person for money, and obtains it (*Reg.* v. *Grantham*, 11 Mod. 222 ); or, in selling a horse he knows to be blind, willfully represents him to be sound (*State* v. *Delyon*, 1 Bay, 353 ); or if he knowingly disposes of wrought gold under

the sterling alloy for gold of standard weight (*Rex* v. *Bower*, 1 Cowp. 323). In these and like cases the defendant but utters a naked falsehood, unconfirmed by symbol or token, and was not within St. 33 Hen. VIII. In the case of *Commonwealth* v. *Warren*, 6 Mass. 72, the defendant represented his name to be William Waterman, and that he lived in Salem; and the court said respecting it that, "if a man will give credit to the false affirmation of another, and thereby suffer himself to be cheated, he may pursue a civil remedy for the injury, but he cannot prosecute by indictment."

Now, were the representations which the defendant made to the prosecutrix more than wicked falsehoods, under our statute, or may it be affirmed that his presence when uttering the falsehoods was the exhibition of a false privy token, which induced her to part with her money and assisted him in consummating the fraud? It was a matter susceptible of proof and demonstration, upon inquiry, for she was not bound to take his word touching his assertions that he was an unmarried man or that his name was Smith. His physical presence had no tendency to establish the one fact or the other, and was, therefore, not an agent, in the sense of a token or a symbol, in consummating the deception and accomplishing the fraud. He may have been both a liar and the symbol of a liar, but he himself, considered as a token, did not contribute, by reason of his personal appearance, to the deception. By the statutes of England and many states of the Union the element of a false token or symbol is eliminated, and the law is broadly cast that whoever, by any false pretense, obtains money, etc., with intent to defraud, shall be guilty of the offense. The case of *Reg.* v. *Jennison*, 9 Cox, Cr. Cas. 158, is cited, wherein it appears that defendant was indicted for having obtained money from an unmarried

woman on the false representation that he was a single man, that he would furnish a house with the money, and would then marry her, and it was held that the false representation that he was not a married man was sufficient to support a conviction for false pretenses. But the authority is not in point, as the decision was made under the enlarged English statutes, and the question of a token did not enter into the controversy. Under our statute, the pretense must be accompanied with a false token, and the question presented here is whether defendant was himself a false privy token. We think he was not. He did not attempt to assimilate anything in existence. There are no personal or physical characteristics known to social science whereby an unmarried man may be distinguished from one that is married. So that if a man presents his physical self to another person, and says nothing of his marital state, no one can say whether he at that instant is married or single, from the inspection alone. Testimony must be produced *dehors* the person from which to determine the fact. If he says that his name is Charles Smith, a fictitious character, and that he was unmarried, when he had a wife living, this is a mere *descriptio ·personæ*, and an inspection of the person will neither corroborate nor detract from the statement. If he be denominated a " token," and that token is false, it is only made so by the lie he has uttered; his physical existence does not help to establish it. In other words, he has not assimilated anything of real existence whereby the unwary have been deceived. He did utter a wicked falsehood, and this is a false pretense, but the false token is wanting, and therefore the indictment does not charge a crime. It is necessary to specify the false token in the indictment ( 2 Wharton, Cr. Law, § 1129 ), and this the State

has not done.   The judgment of the court below will therefore be affirmed.

AFFIRMED.

Decided 28 November, 1898.