Argued October 29, 1965, reargued February 1, affirmed
March 16, 1966

# STATE OF OREGON *v.* ALTIG

412 P. 2d 25

*Francis F. Yunker,* Portland, argued the cause and filed a brief for appellant.

*Lewis B. Hampton,* Deputy District Attorney, Portland, argued the cause, and *George M. Joseph,* Deputy District Attorney, Portland, reargued the cause for respondent. With them on the briefs was George Van Hoomissen, District Attorney, Portland.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, GOODWIN, DENECKE, HOLMAN and LUSK, Justices.

GOODWIN, J.

Defendant was convicted of violating ORS 165.030[1] and appeals. The indictment alleged that the defendant, as an agent entrusted with the money of another, unlawfully and feloniously, with intent to defraud, converted the money to her own use.

■ The issue is whether the evidence was sufficient to justify the submission of the case to the jury. In considering this question, we examine the entire record, including evidence put on by the defendant. *State v. Gardner,* 231 Or 193, 372 P2d 783 (1962).

---

[1] "Any person who, being a banker, broker, merchant, attorney, employe or agent and intrusted with the money, funds, credits, assets or other property, whether tangible or intangible, of another for sale, custody, management or care, with intent to defraud, converts all or a part of such money, funds, credits, assets or other property to his own use or benefit, or to the use or benefit of another not entitled thereto, shall be punished upon conviction by imprisonment in the penitentiary for not more than five years, or by imprisonment in the county jail for not more than one year, or by a fine of not more than $1,000."

The record contains evidence from which the jury could have found the following facts:

Defendant was president of a corporation known as American Escrows, Inc. She was the general manager and was in sole charge of the business. A police officer testified that she told him she was American Escrows.

A Mr. and Mrs. Caldwell, owners of an Oregon City fuel and ice business, agreed to sell their business to two cousins named Parkison. The Caldwells suggested that the defendant be employed to close the transaction by means of an escrow. On December 23, 1963, the defendant telephoned the Parkisons and asked them to come to her office, which they did. Defendant then asked them for the balance of the purchase price.

The Parkisons drew a check for $6,540.23 (on the wrong branch of the Parkison's bank),[2] and the defendant immediately deposited it in her trust account. The same day, the defendant drew a $3,500 check upon her trust account and mailed it to one Wilson in response to a demand by Wilson's attorney, who had been pressing her for payment of a sum owed Wilson from a transaction unrelated to the Caldwell-Parkison transaction.

The Wilson check was paid by the bank, which pay-

[2] This check was eventually dishonored and the amount thereof was charged back to the defendant's account. This fact, however, is irrelevant in this prosecution. The Parkisons later gave her a new check, which was good. When deposited, the new check did not build up the defendant's account enough to satisfy the Parkison escrow. The defendant's intervening peculations with the account had placed the account in an overdrawn condition during the period from December 23 to December 28 when the Parkisons gave her a new check. The new check covered the overdraft, but left a balance far too small to cover the escrow.

ment overdrew the trust account. This check would have drawn the balance in the defendant's trust account substantially below the amount due the Caldwells under the terms of their agreement with the Parkisons even if the Parkison check had been drawn on the proper bank. At all times after the Parkisons' new check was deposited, the balance in the trust account remained inadequate to pay the Caldwells.

Before the trust account could again be restored to a balance that would cover the obligation to the Caldwells, the defendant's business was closed and she left the state. The Caldwells made many demands for payment, but were never paid.

■ There was a conflict in the evidence whether the defendant actually knew the condition of her trust account. She swore that she did not. The jury could have found her testimony to be of doubtful probative force, however, in the light of the evidence taken as a whole. She admitted, for example, having had numerous conversations with her bankers concerning overdrafts.

■ In her appeal, the defendant is apparently laboring under the misapprehension that the state was required to prove some form of common-law larceny in order to get to the jury. Such is not the law. The state had no duty to prove who had "title" to the money. The defendant was accused of violating a specific statute which denounces certain conduct if committed with a specific intent. We need not decide the rights of possible claimants to the money, or whether the kind of embezzlement charged in the case at bar would have been a crime at common law. We are required to test the evidence only against the statute in question.

The elements of the crime charged were these:

(1) That the defendant was a person entrusted with the property (money) of another;

(2) That the defendant appropriated all or part of such money to the use or benefit of one not entitled thereto; and

(3) That the defendant did so with fraudulent intent.

The evidence was uncontradicted that the defendant was entrusted with the Parkisons' money. It was undisputed that she deposited the Parkisons' money in her bank account and that she immediately drew the account down in order to pay a debt to one Wilson, who had no interest in the Parkison-Caldwell transaction. She continued to draw checks on the account, and on January 6, 1964, the account contained $175.36. None of the Parkisons' deposit went to persons authorized to participate in the Parkison escrow. The Parkisons' debt to the Caldwells was never paid.

■ The jury could have drawn the inference that the defendant used the money of the Parkisons (or those entitled to the ultimate distribution of the escrow) to pay her debt to Wilson, and that the defendant's intent was fraudulent.

■ At the trial and in this court the defendant has made much of the fact that she was acting as an officer of a corporation. We have been cited to no authority that legalizes embezzlement by persons who have incorporated their business. See *State v. Bengtson,* 230 Or 19, 367 P2d 363, 96 ALR2d 150 (1961). The question for the jury was whether the defendant, with the requisite intent, did the acts the statute forbids,

whether in a corporate capacity or in some other form of doing business.

Affirmed.

SLOAN, J., dissenting.

The indictment in this case charges:

"HAZEL ALTIG is accused by the Grand Jury of the County of Multnomah and State of Oregon, by this indictment of the crime of Converting Intrusted Property committed as follows:

"The said HAZEL ALTIG on or about the 1st day of January, A.D. 1964, in the County of Multnomah and State of Oregon, by, through, together with and in the name of American Escrow, Inc., a corporation, being the agent of Floyd Parkison and Roy Parkison and in her capacity as such agent being intrusted with the money, funds, credits and assets of the said Floyd Parkison and Roy Parkison in the amount of $6,540.23, for sale, custody, management and care, the said HAZEL ALTIG did unlawfully and feloniously, with intent to defraud, convert the said money, funds, credits and assets to her own use and benefit, contrary to the Statutes in such cases made and provided, and against the peace and dignity of the State of Oregon.

"Dated at the City of Portland, in the County aforesaid, this 30th day of June, A.D. 1964."

The conclusions in the majority opinion supporting guilt are unrelated to the allegations of the indictment. Actually, Parkisons got everything they paid for and in their testimony made no claim that property of any kind was embezzled from them. On the other hand, Caldwells, the sellers, did not testify that they were entitled to any of the proceeds. Mr. Caldwell testified that he inquired of defendant as to when one of his creditors was to be paid.

The state, admittedly, has not presented evidence which supports the allegations of the indictment. During the trial, in the briefs filed here and at two oral arguments the state has advanced at least four different theories as to when and how defendant embezzled. None of the theories have any reference to the allegations of the indictment.

This conviction is sustained upon facts assumed to be or known to be in existence, aliunde the record, not by facts proven. The judgment should be reversed.